# UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MISSOURI
## SOUTHEASTERN DIVISON

| | |
|---|---|
| THE HANOVER INSURANCE COMPANY, *A New Hampshire Corporation,* <br><br> Plaintiff, <br><br> vs. <br><br> FIRST MIDWEST BANK OF POPLAR BLUFF, <br><br> Serve: <br> Joseph T. McLane, President/CEO <br> 704 North Westwood Blvd. <br> Poplar Bluff, Missouri, 63901 <br><br> And <br><br> DENNIS YOUNG, <br><br> Serve: <br> Dennis Young <br> 2811 North 14th Street <br> Poplar Bluff, Missouri 63901 <br><br> Defendants. | Case No. _____ <br><br> JURY TRIAL REQUESTED |

## COMPLAINT

Plaintiff, The Hanover Insurance Company ("plaintiff" or "Hanover"), for its *Complaint* against defendants First Midwest Bank of Poplar Bluff and Dennis Young, states:

### *PARTIES, JURISDICTION, AND VENUE*

1.  The Hanover Insurance Company ("Hanover") is a corporation organized and existing under the laws of the State of New Hampshire and is duly authorized to transact business in the State of Missouri.

2.  Defendant First Midwest Bank of Poplar Bluff ("FMB") is and was at all times relevant hereto a bank chartered by the State of Missouri with its principal place of business located

{6088/015//01229028;7 }

within the State of Missouri at 704 North Westwood Blvd., Poplar Bluff, Missouri 63901.  FMB may be served with process through its President and Chief Executive Officer, Joseph T. McLane.

3. Defendant Dennis Young ("Young") is and was at all relevant times herein a resident of the State of Missouri and may be served with process at his residence located at 2811 North 14th Street, Poplar Bluff, Missouri 63901.

4. Jurisdiction is proper pursuant to 28 U.S.C. § 1332(a)(1) because the matters in controversy exceed $75,000.00, exclusive of interest and costs, and Hanover and defendants are residents of different states.

5. Venue is proper because FMB and Young, respectively, reside within the Southeastern Division of the Eastern District of Missouri.

## GENERAL ALLEGATIONS

### *Payment and Performance Bonds Issued to Harding Enterprises*

6. As a surety, Hanover issues from time to time payment and/or performance bonds to contractors performing work on government owned projects.

7. In this capacity, Hanover issued payment bonds and performance bonds to Harding Enterprises, LLC ("Harding Enterprises") for multiple projects for which Harding Enterprises won bids and performed work.

8. The payment and performance bonds include the following:

    (1) BCA1018579;

    (2) BCA1025131;

    (3) BCA1025153;

    (4) BCA1025158;

    (5) BCA1025165;

   (6)  BCA1036276;

   (7)  BCA1036277;

   (8)  BLA1025080; and

   (9)  BLA1025149.

 9. These payment and performance bonds (collectively, the "Bonds") were for construction work on various projects located in Iowa, Missouri, Mississippi and Louisiana (collectively, the "bonded projects").

 10. Hanover issued the Bonds to guarantee Harding Enterprises' performance obligations on these bonded projects, which Harding Enterprises and the various government entities had contracts, and to ensure the payment obligations Harding Enterprises had to its subcontractors and material suppliers.

 11. In consideration of and to induce Hanover to issue the Bonds, Harding Enterprises and its members, Greggory Harding and Dawn Harding (collectively, the "Hardings") signed and delivered to Hanover a General Agreement of Indemnity (the "GAI").  A true and accurate copy of the GAI is attached hereto as **Exhibit A** and is incorporated herein by reference.

 12. The Hardings' execution of the GAI was a material reason that Hanover issued the Bonds.

 13. The GAI obligates the Hardings to indemnify and hold Hanover harmless from any and all liability under the Bonds.

*The Financing and Special Account Agreement*

 14. Subsequent to the execution of the Bonds and the GAI, and after multiple claims by unpaid subcontractors and suppliers had been made and some paid by Hanover, the Hardings informed Hanover that Harding Enterprises was experiencing financial difficulty and, without

Hanover's financial assistance, Harding Enterprises would be unable to pay for, perform, or complete the performance of the work on many of the contracts for which Hanover had issued the Bonds.

15. Accordingly, the Hardings requested that Hanover provide Harding Enterprises with financial assistance in the form of payments for Harding Enterprises' payroll, payments owed to certain subcontractors and suppliers of Harding Enterprises on the bonded projects, and payments for Harding Enterprises' overhead and other general and administrative expenses specific to its work on the bonded projects. In exchange for this financial assistance, the Hardings expressly promised and agreed in writing that all bonded contract trust funds would be turned over and deposited with Hanover or Hanover's designated representatives.

16. Section 4 of the GAI permitted Hanover to make these financial accommodations requested by the Hardings. That section provides:

> **Advances:** With respect to each Bond executed by the Surety in connection with a contract, the Surety is hereby authorized, in its sole and absolute discretion, to make or guarantee advances or loans for the purpose of any contract or other obligation relating to any Bond without the necessity of seeing to the application thereof, and the Indemnitors agree both that all such loans and advances, unless repaid with legal interest by the Indemnitors to the Surety when due, shall be conclusively presumed to be an indemnity obligation of the Indemnitors to the Surety, and that the Surety shall have the absolute right to cease making or guaranteeing advances or loans at any time and without notice to the Indemnitors.

17. In response to the Hardings' express agreement to use these funds for the bonded projects and to repay the funds, Hanover and the Hardings entered into a certain Financing and Special Account Agreement, dated August 26, 2016 (the "Financing Agreement"). A true and accurate copy of the Financing Agreement is attached hereto as **Exhibit B** and is incorporated herein by reference.

18. In the Financing Agreement, the Hardings acknowledged, admitted and expressly agreed, among other things, that:

   a. Harding Enterprises was financially unable to perform and/or complete the performance of the work under the Bonded Contracts;

   b. Certain subcontractors and suppliers of labor and/or materials with respect to the Bonded Contracts and the bonded projects had not been paid;

   c. As a result of (a) and/or (b) above, Harding Enterprises was in default under the Bonded Contracts and the Hardings were in breach of and in default under the GAI;

   d. Because the Hardings had no other source of funding or money to cure Harding Enterprises' defaults under the bonded contracts and their breaches and defaults under the GAI, the Hardings were requesting Hanover's financial assistance;

   e. Hanover's losses are losses under the GAI and this agreement for which the Hardings are obligated to indemnify and reimburse Hanover; and

   f. By providing financial assistance to Harding Enterprises, Hanover was performing its obligations under the Bonds and was not acting as a volunteer.

19. Section II.1 of the Financing Agreement provides for the establishment of a Special Account for the receipt of the Bonded Contract Funds and for Hanover's advances and loans to the Special Account as set forth in the Financing Agreement.

20. Under Section II.2 of the Financing Agreement, the Hardings agreed that Hanover was the sole owner of the Special Account and that the Hardings had no beneficial interest in the Special Account.

21. Pursuant to Section II.6 of the Financing Agreement, Hanover and the Hardings agreed that all Bonded Contract Funds collected by Harding Enterprises or Hanover, and all monies which Hanover may advance or loan to Harding Enterprises were to be deposited into the

Special Account and that the Bonded Contract Funds were not to be deposited in any other account of Harding Enterprises.

22. Section III of the Financing Agreement governs the use of the Bonded Contract Funds from the Special Account. Section III.1 provides, in pertinent part:

> **Use for Bond Projects**. The Bonded Contract Funds and any other funds or monies contained in the Special Account shall be used as set forth in this Agreement. The Bonded Contract Funds and any other funds or monies contained in the Special Account, including the Surety's advances and loans, shall be used solely for the payment of all labor and material costs incurred by the Principal and any amounts due to the Principal's subcontractors and suppliers, including amounts for rental of equipment from others which is actually used in the prosecution of the work under the Bonded Contracts, and which are necessary to complete the performance of the work under the Bonded Contracts and for which the Surety may become liable under the Bonds. The funds or monies in the Special Account shall also be used to repay and reimburse the Surety for the Surety's Losses in accordance with the terms of this Agreement. …
> It is specifically understood and agreed by the Principal, the Indemnitors and the Surety that the Bonded Contract Funds and any other funds or monies contained in the Special Account shall not be used to pay the obligations of the Principal on contracts not bonded by the Surety.

23. Pursuant to the terms and conditions of the Financing Agreement and the Bonds, Hanover paid claims and advanced funds to Harding Enterprises, which together total $3,807,673.03. These funds were to be used only by Harding Enterprises for the sole purpose of paying labor and material costs incurred by it to perform work on the Bonded Contracts and for which Hanover may become liable under the Bonds.

### *The Default by Harding Enterprises and Hanover's Performance Under the Bonds*

24. Ultimately, for all of the bonded projects, Harding Enterprises failed to complete performance or pay its subcontractors and suppliers, which constituted a default under the GAI.

25. As a result, Hanover's obligations under the Bonds was triggered.

6

26. Hanover declared default against Harding Enterprises and completed Harding Enterprises' performance obligations on the bonded projects and paid payment bond claims of subcontractors and suppliers.

27. In the end, Hanover's total loss, exclusive of legal and consultant expenses, costs and fees, on the Bonds exceeded $5,000,000.00.

28. Section 2 of the GAI provides that the Hardings were to jointly and severally indemnify Hanover from and against "any and all liability, demands, losses, claims, suits, judgments, fees, costs and expenses of whatsoever kind or nature (including, but not limited to pre and post-judgment interest, court costs, consultant and counsel fees and expenses) which Hanover may pay, sustain or incur by reasons of or in any manner as a consequence of…".

29. Pursuant to its rights under the GAI, on or about June 23, 2017, Hanover demanded collateral and reimbursement from the Hardings in the amount of $4,975,000.00.

30. The Hardings failed to post any collateral or reimburse Hanover.

31. Hanover remains damaged because of the Hardings failure to post collateral or reimburse it for the monies it paid pursuant to the Bonds.

***The Hardings' Misappropriation of Monies that Were Required to Have Been Used for Harding Enterprises' Performance Obligations on the Bonded Projects and Payment to Bonded Subcontractors and Suppliers***

32. In October 2016, and despite all it had done for the Hardings, Hanover discovered that the Hardings were misappropriating large sums of money they received from the bonded project owners and from Hanover that were expressly required to have been used for Harding Enterprises' performance obligations on the bonded projects and payment to bonded subcontractors and suppliers (collectively, the "Bonded Proceeds").

33. At this time, Hanover did not know the extent of the Hardings' scheme.

34. Hanover intervened by sending the bonded project owners letters demanding that Bonded Proceeds be paid to Hanover. Unfortunately, these bonded project owners did not direct the Bonded Proceeds to Hanover until December 2016, which turned out to be too late.

35. After nearly all of the Bonded Proceeds had been paid by the bonded project owners to Harding Enterprises and then misappropriated, Hanover discovered the extent of the scheme.

36. Specifically, Hanover discovered that the Hardings had used cashier's checks and other forms of transfer to move the Bonded Proceeds through the financial system, ending in payments to Mr. Harding; Mrs. Harding; their son, Josh Harding; their benefactor, Young; their primary lender, FMB; and for the benefit of their newly purchased ranch, Diamond H. Ranch; among others.

37. Concurrent to Hanover's discovery of the Hardings' fraud, Mr. And Mrs. Harding and Harding Enterprises, respectively, were in the midst of bankruptcy proceedings.

38. During a Section 341 hearing in Mr. and Mrs. Hardings' bankruptcy proceeding, Mr. Harding testified to the Hardings' motivation for engaging in the scheme, including specifically their use of the cashier's checks to move Bonded Proceeds.

39. When asked why they had engaged in so many cashier's checks transactions, Mrs. Harding testified that "Basically we were doing that because there were some judgements out there, and I didn't want to leave any money in the account…"

40. Mr. Harding subsequently confirmed this, testifying their reasoning for using cashier's checks was they were "issued specifically so that the money came out of the checking account, so that it would not be garnished or seized by other creditors."

41. Together, these two statements confirm that the Hardings were acting with intent to defraud, delay or hinder creditors, including chiefly Hanover, which was owed over $5,000,000.

42. Additional direct evidence of the Hardings' actual intent to defraud, delay or hinder Hanover was a letter sent by Mr. Harding, in which he declared he would take the Corps payments for himself rather than leaving them in trust for subs, suppliers, and Hanover, as the completing surety and indemnified party under the GAI, as required.  Mr. Harding clearly knew that Hanover would continue to incur costs to complete the work Harding Enterprises had abandoned or otherwise was defaulted, and because Harding Enterprises did not pay subcontractors and suppliers.  Mr. Harding knew he and his wife had an obligation to indemnify Hanover under the terms of the GAI but did not care.

43. Nearly all of these fraudulent transactions in the scheme involved accounts held at FMB.

44. In response, Hanover made demand on FMB that it make Hanover whole.  FMB refused to do so even though it wrongfully received Bonded Proceeds.

***FMB Knowingly Received and then Benefitted from the Transfer of Bonded Proceeds***

45. FMB received numerous transfers of Bonded Proceeds in the latter half of 2016.

46. Hanover determined that FMB benefitted from the receipt of these Bonded Proceeds in part because Harding Enterprises' loan indebtedness and bank charges were paid.

47. Hanover further determined that, but for the Hardings' misappropriation of the Bonded Proceeds, Harding Enterprises did not have sufficient funds to pay this loan indebtedness and bank charges.

48. From at least July 2016 through January 2017, FMB exhibited at a minimum willful blindness to the Hardings' scheme, burying its head in the sand:

> (1) FMB issued numerous cashier's checks at the request of the Hardings, often payable to or deposited to FMB accounts held by Mr. Harding, Mrs. Harding, Josh Harding, Young, and Diamond H. Ranch;

9

    (2)  FMB continued to engage in a lending relationship with Harding Enterprises; and other businesses controlled by the Hardings; and

    (3)  FMB performed little to no due diligence of Harding Enterprises, its accounts with FMB, or the Hardings.

  49. FMB knew or should have known the Bonded Proceeds that were deposited with it were from bonded project owners for performance obligations or payment of bonded subcontractors or suppliers.  FMB approved loans and lines of credit for Harding Enterprises based upon its ability to repay. Harding Enterprises presented to FMB its business model including its expectation of revenue from bonded projects.  Thus, FMB knew the deposits that were automatically made, and were tellingly stamped "COE" "USACE" (representing Corps of Engineers (the "Corps"), were coming from the bonded project owners, and specifically were from the Corps.  Additionally, these deposits listed the government contract number to which the payment related.  In short, FMB had before it evidence of the Hardings' scheme to misappropriate.

  50. FMB knew or should have known the laws in place required that payment was first to be made to the bonded subcontractors and suppliers, and then Harding Enterprises was contractually required to use Bonded Proceeds to complete its performance on the bonded projects, and not to keep or transfer these funds for it or FMB's sole benefit.

  51. FMB knew or should have known, or at least questioned, when Harding Enterprises voluntarily elected to pay down to zero ($0.00) its line of credit, it did not have the funds available to do so except for the Bonded Proceeds that it was required to use elsewhere.

  52. In allowing this to happen, FMB knowingly permitted the depletion of Bonded Proceeds despite Harding Enterprises' ongoing obligations on the bonded projects, and separately to Hanover.

53. The Hardings' scheme should have been obvious to FMB. The cashier's checks purchased from FMB by the Hardings were often made payable to the Hardings themselves or deposited to accounts controlled by the Hardings or by their son, Josh Harding. Certain cashier's checks were purchased from FMB using other FMB cashier's checks; when these were deposited with an outside bank, they were presented to FMB for payment. FMB never declined payment.

54. Unfortunately, had FMB performed the appropriate due diligence, or not elected to look the other way, it would have discovered the placement, layering, and integration activities that made up the Hardings' scheme. A simple examination of the accounts at FMB would have shown the exchange of cashier's checks for new cashier's checks, including that Harding Enterprises spent $800,000.00 from its account with FMB on four (4) cashier's checks, which then were converted into eleven (11) new cashier's checks.

55. FMB also permitted an account for Diamond H. Ranch to be opened and funded with Bonded Proceeds. This account was opened in January 2017 and funded with Bonded Proceeds coming from Corps' payments made to Harding Enterprises and deposited with FMB in October and December 2016. FMB performed little to no due diligence on Diamond H. Ranch and failed to require verification of where the funds came from.

56. FMB also approved a loan to Diamond H. Ranch for it to purchase a substantial parcel of real estate. The loan exceeded $900,000. Mr. Harding was the guarantor for this loan. He is not a member of the limited liability company that operates Diamond H. Ranch. FMB also set up multiple accounts in Diamond H. Ranch's name – at Mr. Harding's request – which were ultimately used in the scheme to misappropriate Bonded Proceeds. All of this was done without a single red flag raised by FMB.

57. Moreover, it is believed that not one time over the course of seven (7) months – July 2016 through January 2017 - and despite the fact over one hundred (100) cashier's checks had been issued by it, did FMB file a suspicious activity report (a "SAR") detailing the possible violation by the Hardings of laws or regulations.  These cashier's checks totaled $2,871,957.00, a **1200% spike** in the Hardings' cashier's check transactions over the previous time period.  Couple this with the complete stop in deposits coming from the Corps or other government entities, Hanover contends that FMB should have at least filed a SAR, which detailed the suspicious transactions - including the fact a ridiculous number of cashier's checks had been issued.  FMB presumably has risk officers on site to monitor such fraudulent activity and file a SAR, but there was nothing done to detect the scheme.

58. Other facts show FMB's failings including that in January 2017, FMB knew Mr. Harding's credit score was 628 and the credit report stated, "serious delinquency and derogatory public record or collection filed" and that " a number of accounts with delinquency".  FMB acknowledged only $10,000 in income was reported for 2015.  FMB proceeded to extend almost $1,000,000 to the Hardings at Mr. Harding's request.

59. FMB later extended the maturity term for the line of credit, which the Hardings utilized to carry out their scheme.  This line of credit was paid down using Bonded Proceeds that did not belong to Harding Enterprises or FMB.  FMB benefitted each time the line was paid down or the term was extended. The last time FMB extended the line of credit was in February 2018.  At this point in time, Harding Enterprises did not exist as a corporate entity and there had been no deposits from bonded projects in over one year.  Presumably knowing these facts, FMB ignored the terms of its promissory note with Harding Enterprises when it extended the term because Harding Enterprises had been dissolved, which is an event of default under the terms of the note.

60. Ultimately, FMB did not receive the Bonded Proceeds in good faith. And actually, Hanover contends FMB acted in bad faith because at a minimum it willingly buried its head in the sand.

61. FMB has now had years to benefit from the Hardings' scheme, yet upon demand by Hanover, FMB has failed and refused to make Hanover whole for its losses.

62. As a result, FMB should be found liable for the misappropriated Bond Proceeds paid to it because the transfers were fraudulent.

***Young Knowingly Received and then Benefitted from the Transfer of Bonded Proceeds***

63. Hanover determined that Young also benefitted from the receipt of Bonded Proceeds because the Hardings' loan indebtedness to him was paid.

64. Hanover further determined that, but for the Hardings' misappropriation of the Bonded Proceeds, the Hardings did not have sufficient funds to pay the loan indebtedness owed to him.

65. Hanover contends Young knew or was complicit with the Hardings' scheme to misappropriate the Bonded Proceeds, and as a result, Young received some Bonded Proceeds without providing fair market value to the Hardings.

66. Young was closely involved in Harding Enterprises' bonded work, its operation, and with the Hardings generally, and as a result, Young knew or should have known the Bonded Proceeds that were transferred to him were from bonded project owners for performance obligations or payment of bonded subcontractors or suppliers.

67. Young knowingly permitted the depletion of Bonded Proceeds despite Harding Enterprises' ongoing obligations on the bonded projects, and separately to Hanover.

68. Young did not receive the Bonded Proceeds in good faith. Like FMB, Hanover contends Young actually acted in bad faith when he knew or was complicit with the Hardings' scheme.

69. Young's actions caused damage to Hanover, which had the equitable and legal right to receive and use the Bonded Proceeds to complete Harding Enterprises' performance on the bonded projects and resolve payment bond claims.

70. Despite demand by Hanover, Young has failed and refused to make Hanover whole for its losses.

71. Young should be held liable for the misappropriated Bond Proceeds paid to him because the transfers were fraudulent.

**Count I – Action for Relief Against Fraudulent Transfers to FMB**

72. Hanover incorporates by reference each of the other paragraphs in this Complaint as though fully set forth herein.

73. At all times relevant herein, Hanover was a creditor to the Hardings.

74. By July 2016, the Hardings' debts were greater than all of the Hardings' assets at a fair valuation.

75. With actual intent to hinder, delay or defraud one or more creditor, including chiefly Hanover, the Hardings effected the following transfers to FMB on the corresponding dates:

　　a. 9/15/2016 loan payment in the amount of $4,743.43

　　b. 9/15/2016 line of credit payment in the amount of $395,300.42

　　c. 9/16/2016 loan payment in the amount of $1,046.59

　　d. 9/27/2016 payment to FMB in the amount of $1,859.50

　　e. 10/14/2016 line of credit payment in the amount of $510,438.96

14

  f. 10/14/2016 payment to FMB for the purchase of cashier's checks totaling $800,000.00

  g. 11/4/2016 payment to FMB in the amount of $23,606.58

  h. 11/8/2016 payment to FMB in the amount of $13,194.80

  i. 11/9/2016 payment to FMB for a $12,000.00 cashier's check

  j. 12/5/2016 line of credit payment in the amount of $602,542.88

  k. 12/8/2016 payment to FMB in the amount of $9,500.00

  l. 12/12/2016 payment to FMB in the amount of $32,288.71

  m. 12/14/2016 payment to FMB in the amount of $425,000.00

  n. 12/19/2016 payment to FMB in the amount of $50,000.00

  o. 1/30/2017 payment for the purchase of a cashier's check in the amount of $200,000.00

**WHEREFORE**, Plaintiff The Hanover Insurance Company prays for relief under Mo. Rev. Stat. § 428.039 in its favor and against Defendant First Midwest Bank of Poplar Bluff and asks the Court to order:

 a) Avoidance of the transfers to FMB listed above, to the extent necessary to satisfy Hanover's claim;

 b) An attachment or other provisional remedy against the assets transferred or other property of the transferee in accordance with the procedure prescribed by applicable laws of this state;

 c) Statutory pre and post judgment interest as allowed by law;

 d) All other relief this Court deems just and proper.

### Count II - Action for Relief Against Fraudulent Transfers to Young

76. Hanover incorporates by reference each of the other paragraphs in this Complaint as though fully set forth herein.

77. With actual intent to hinder, delay or defraud one or more creditor, including chiefly Hanover, the Hardings effected the following transfers to Young on the corresponding dates:

   a. 9/23/2016 payment in the amount of $8,000.00

   b. 10/17/2016 payment in the amount of $47,600.00

   c. 10/24/2016 payment in the amount of $8,000.00

   d. 10/31/2016 payment in the amount of $149,640.00

   e. 11/22/2016 payment in the amount of $8,000.00.

**WHEREFORE**, Plaintiff The Hanover Insurance Company prays for relief under Mo. Rev. Stat. § 428.039 in its favor and against Defendant Dennis Young and asks the Court to order:

   a) Avoidance of the transfers to Young listed above, to the extent necessary to satisfy Hanover's claim;

   b) An attachment or other provisional remedy against the assets transferred or other property of the transferee in accordance with the procedure prescribed by applicable laws of this state;

   c) Statutory pre and post judgment interest as allowed by law;

   d) All other relief this Court deems just and proper.

**PLAINTIFF THE HANOVER INSURANCE COMPANY REQUESTS A JURY TRIAL ON ALL CAUSES OF ACTION PERMITTED.**

Respectfully submitted,

**LEVY CRAIG LAW FIRM**
A PROFESSIONAL CORPORATION

By  */s/ Jason S. Leiker*
    Jason S. Leiker            MO #53973
    4520 Main Street, Suite 1600
    Kansas City, Missouri  64111
    (816) 474-8181
    Fax: 816/382-6606
    jleiker@levycraig.com
    *Attorney for Plaintiff*